Hello. Now, you're not listed on the brief, are you? I am, yes, your honor. Certainly listed on the brief. Good morning, your honor. It's Hannah Chardoff on behalf of the Hickson's. This case is about a disabled man who died after he was denied medical care because his doctors assumed that he had no quality of life. Michael Hickson was consistently assessed by a defendant hospital as having a 70% chance of survival. He responded to antibiotics and he showed signs of improvement in the days leading to his death. Yet defendants placed him in hospice care, ordering that he be denied not only life-saving medical treatment, but also food and IV hydration. So the 70% chance of survival was this muse, this hospital's sort of introductory computation of whatever. But I thought the doctors had testified or had stated that they did not think that 70% was accurate. They thought his prognosis was much poorer than that. Even with treatment. That information is not in the record unless you're referring, your honor, to the form that Dr. Vo filled out. Well, he says prognosis poor, right? Even with the treatment. And if you withdraw the treatment, then it's likely death. So the facts as we currently have them, again, this is at the motion to dismiss stage, are that he did have a 70% chance of survival. And that is in the record twice and on two dates. First, on the date of June 2nd that he's admitted, Mr. Hickson was admitted to the hospital. And also on June 5th, the day he was referred to hospice care. And it's also in the record that Dr. Cantu stated to palliative care that Mr. Hickson had no quality of life due to his disabilities. So that is certainly something, Judge Wilson, that I think is worthy of further factual investigation. Well, but where are we to police the line between a doctor's legitimate assessment of the patient's condition prior to presenting with the urgencies of the moment? I are entitled to consider his disabilities and his other comorbidities, correct? If that is part of a reasoned medical judgment and not dictated by- But how are we supposed to know when is what? Didn't both doctors say he had no quality of life? And one of them said something about, well, most of my patients are walking and talking. That's exactly correct, Judge Jones. And I think, Judge Wilson- That indicates something less than sympathy. It does. And I think that is the kind of questions you're asking, Judge Wilson, are certainly things that we would explore more on discovery. But at this stage, at this motion to dismiss stage, I think what we're really looking at here is a system that looked at someone who was coming into the hospital, who could walk and talk, and immediately trying to provide treatment to them. Whereas separately looking at someone like Mr. Hickson, who's quadriplegic, and just shunting him over to hospice immediately. But don't you have to show that the treatment decisions, just presuming that this could be a cognizable claim, it was solely caused because of his disability? Yes, that is the standard under the Rehabilitation Act. And I think, again, that's where the motion to dismiss standard comes in here. That whether a judgment was made for purely medical reasons, or whether it was based on this biased assumption, would be something that certainly is worthy of further investigation for a jury to decide. May even be relied on expert testimony in this case. But rather, the district court here drew this very, very harsh line, and assumed because there's medical treatment decision, that's it. Doctors are immune from any kind of disability discrimination, and that... That cannot be the law. That cannot be the law. And I think, when you look at this assumption that someone who's quadriplegic has no quality of life, that is, again, actively contradicted in the case of Mr. Hickson by the facts that we have here. As you said, didn't they re-evaluate, or they thought about re-evaluating hospice even after he got into hospice, and had all his meds have been taken away? Yes, that's correct. That's incredible to me. Yes, and even after his... I would say, even after his medication had been taken away, again, his food had been cut off. He was no longer getting tube feeds. He was not getting any IV hydration, and he stayed that way for six days before he died. Meanwhile, he's alert. He's expressing hunger, and the nurses here are wondering, okay, maybe he shouldn't be on hospice care anymore. But still, there's no re-evaluation that's done. There's no movement to take him out of hospice care. How much of this may have... So, you've already settled with elder care? That's correct, Josia. Yes, and I do think elder care, yes, we've settled with them, but also the doctors here, because of that form I think you were referring to earlier, Judge Wilson, really gave Trane and Drake no meaningful choice here. They presented the facts because of their bias. They presented the options as really non-existent. So, this is talking... We're focused on the doctor's bias and almost... How old was his trainee guardian? I don't believe that's in the... She was a trainee, right? She was a trainee. That is correct. That is correct. But that's on the court that appointed them as guardian, not the healthcare providers, correct? The guardian... There's no allegation against the court, certainly. Well, no, but the court appointed the guardian. Well, you'd depose her if you got past the motion to dismiss. I mean, you know, if we remanded and you got past motion to dismiss, she'd be deposed. Yes, and it's another example of I think there are more fact questions that are worthy of being explored. So, it's your position that the guardian's consent to this course of treatment is not dispositive here? It... Yes, Judge Wilson, that is our position because no meaningful choice was provided. The framing on that treatment form, which we know was the basis for the guardian's decision, was that he had low baseline functioning and therefore the outcome was futile. And again, I think we can draw a direct line back to that low baseline functioning to this assumption that someone who's quadriplegic, that someone who can't walk and talk, has no quality of life, which it's not even true that he couldn't talk. He was able to speak with his family. It's in the record that he talked with them, he laughed with them, he prayed with them. He had a fulfilling life, really full of love in this case. And that was just ripped away and he walked into the hospital and said, no, you can't walk and talk, straight to hospice for you. And I think if you look at the Second Circuit's case law and the Magoogan case and also the First Circuit's case law and Leslie, they establish a good test that I'd point this court to. The cases in this circuit have not directly addressed a question quite like this. While there are cases about claims for medical care under the ADA or the Rehabilitation Act, none of them address a case like this where the allegation is that patients who are not disabled are getting treatment and a patient who is disabled is not getting treatment with this very specific fact of bias really undercutting. But how do you police the floodgates here? I mean, every medical malpractice claim can basically be grounded in a disability, then gets in through the Rehabilitation Act? No, Your Honor. That's clearly not the law either. Well, we don't have a negligence claim before us here. That's correct, Judge Jones. There is no, well, there's no claims about medical malpractice. Texas law requires an expert witness to file a claim and for whatever reason, your client didn't do that. So the floodgate in Texas would not be, you know, is high. That's correct. Well, no, I mean, it means any medical malpractice case can circumvent that process and now become a disability discrimination case. That's what I'm getting at. I thought the medical malpractice claim was dismissed. The medical malpractice claim was resolved on summary judgment and this is not an issue here. But I see your concern, Judge Wilson, and I think really looking very specifically to the facts of this case, there is a principled line. And again, the First Circuit and the Second Circuit have drawn that line, which is that when a decision is made by a doctor, not for reasons that are truly based in medical knowledge, but for reasons that are dictated by bias and inappropriate stereotyping of people with disabilities, then that's when a claim can proceed. What if it's both? I think it can be both. But it fails then because you couldn't show that it's the sole cause of the discriminatory decision. Well, that's not... I would say, maybe Judge Jones is where you were going, that in that case, that's a question for expert testimony. That's a question for a jury to decide after further development of the fact. If you were to take depositions, Judge Jones, as you were suggesting, that would be the opportunity to really understand further. And we hope to get there in this case as well. But you don't disagree that you have to show at some stage of the game, whether it's now or later, that this is the sole cause of the medical decisions that were made? That is the standard. You're correct, Judge Wilson. Could you focus on your IIED claim a little bit? Exactly what are you saying was the intentional infliction? So there's two theories. One is the denial of care for a discriminatory basis. And we point to cases from other circuits where that has been sufficient to find an IIED claim, or at least to proceed further. And that claim was just completely not addressed by the district court, even though it was included in our briefing below on the motion to dismiss. And then the other theory is the harassment and the public discussion of Mr. Hickson's widow, Mrs. Hickson, in the days and weeks following her husband's death. Okay. So it is solely related to the Facebook posts and after the death? Good clarification, Judge Jones. No. It also includes the treatment that she received while she was attempting to visit Mr. Hickson as well. And she's calling the hospital every day to find out what's happening to him. They're telling her, don't be involved, giving her no information, or even saying, call back later when they know he's already dead. That is really extreme. And that is the kind of thing that we're referring to here. And again, this claim was resolved on a motion to dismiss. And at minimum, further factual development is necessary here. But the allegations and the facts as we know them, which of course this court accepts as true for purposes of this stage, do, I think, establish those elements are worthy of further investigation. Are you asserting? I'm sorry. Was the intervention of security when she went to the hospital, is that something that the guardian purported to approve? That is what the doctors in the hospital here have alleged. And you'll forgive me, I don't have the allegations from the state court pleading that the defendants here brought in. I mean, how much right does a guardian have to... I don't understand at all that the guardian had a to give permission to the St. David's CEO to give out the man's medical status and allow him to rebut what the wife had claimed in a Facebook. A guardian is a guardian for the sick person, not for the hospital or the whatever it is after the man passes away. I think that's exactly right, Judge Jones. And I'll say also, whether the guardian said do this or not, defendants here still have their own... They have responsibility for their own actions as well and control over their own actions just because the guardian says to do something that they may find outside the context of his medical care, which is what we're talking about right now. Say something about my deceased ward online is quite a step there. Are you asserting separate informed consent in this failure to guide claim, or is that really one claim? There are separate claims, and I think it comes back, Judge Wilson, to the structure of Texas state law. But Texas doesn't recognize a failure to guide claim. A duty to make sure the guardian is basically equipped to do the guardian's job. I think what we're saying here is because the Texas informed consent law is so kind of structured and under the statute, but does not expressly cover situations of hospice care and referral to hospice care, that that's what we're suggesting, that there are other ways that the court should have considered what information the guardian was provided in this case. I see my time's up, Your Honor. I just have one other question. Maybe it's outside the record. How long had this guardianship dispute been pending? I don't know off the top of my head, but I will look that up and bring it back to you on rebuttal if it's... Okay, thank you. Yeah, thank you. All right. Mr. Bish? Good morning, Your Honors. May it please the court. For the court's reference, I'll be presenting argument on behalf of the Appley-St. David's Health Care Partnership. Mr. Milch will next be presenting, and I'll be addressing the discrimination claims under the Rehab Act and the ACA. Mr. Milch will be presenting argument on behalf of Appley and regarding the lack of informed consent claim against his client, as well as the 1983 claim on behalf of all Appley's. Mr. Beaman will present argument for Dr. Bowe regarding that informed consent claim. Let me just ask a question. Did St. David's ever apologize to this family? I do not know, Your Honor. Where do you draw the line between DNR and denial of food and hydration to a sick person? Hydration is fluids, water. You die in three or four days normally without water, which is why they search so hard for the victims of earthquakes. Where the heck did that come into hospice care? Your Honor, and I think that's one of the How about if you answer that question first of all, because that applies to any patient, not just disabled ones. It is part of hospice protocol, and to fit it into this act, plaintiffs have argued that the hospital denied Mr. Hickson treatment, that the hospital refused treatment, and that's not accurate. Hospice treatment or hospice care is, in fact, medical I never heard of denying hydration. It is in the record that he was provided with medical care during hospice treatment. He was in the hospital with the oversight of doctors and nurses. The only thing I saw in the record was denied hydration. Do you say that's a disputed fact? What is in the record, Your Honor, is that he was provided with, quote, comfort care. Yeah, and usually, that usually means morphine. It doesn't mean you're going to, you're going, you know, your tongue swells up. You're very uncomfortable if you're dehydrated. Your brain doesn't function right. It's a terrible way to die. And, Your Honor, are you denying that he was not provided hydration? Your Honor, the record is not clear on that point. That is not in the record as to why. Well, if I were the hospital, I would have gone to great lengths to say that was not part of our comfort care. And the one point I want to make sure to get to, Your Honor, is... Two members of this panel know about hospice. Not personally, but... Not yet. Unfortunately, I do as well, Your Honor. Well, I'm not sure which two, but I know one who just lost his grandmother this year, and she was on comfort care. And there is a difference in what Judge Jones is talking about versus, you know, providing comfort care. They just put her out. And I don't know. Again, you're really not answering the question. I thought it was alleged that they removed they stopped feeding him for several days, even when he improved. As far as the 12V6 goes, when he was hungry, yes, they re-administered the feeding tube. But they took it away first. Correct, Your Honor. And did they do the same with fluids? The record is not clear, Your Honor, on the 12V6 issue. Well, what do you do about the statements by the doctors that, well, he has no quality of life. He can't walk. He can't talk. Therefore, comfort care would be a kind choice. Well, I mean, I think the fact that, like you said earlier, Your Honor, I think the doctor is well established, can and must consider comorbidities. And even in Plaintiff's complaint, they set forth that because of his disability, he had, in fact, experienced pneumonia, sepsis, and numerous other medical conditions in the past. And it's even in the complaint that when he did experience those conditions in the past, the same hospital saved his life. And so— Well, do you agree with the— So why did they think his life wasn't worth saving this time? They did not, Your Honor. They made a medical judgment. And that, the Court's more recent opinion, Carter v. City of Shreveport, that was issued after my clients filed its brief in this case. But it addresses this issue for the first time with this circuit, which is whether or not a medical malpractice case can be brought through these discrimination statutes. Well, I mean, do you agree with the District Court's approach that just per se, categorically, they can't be brought? I agree with this Court's analysis, both in the context of the Americans with Disabilities Act and in the context of this Carter opinion, which is the Court has always looked at the substance of the pleadings and determined, is there a claim for medical malpractice? If so, you cannot use the discrimination statutes as a vehicle. And that's consistent with what the District Court did here, which is, I think the quote was, looking at the quote for a complaint. And if you— The exhibit that I've provided, the demonstrative, it provides— It's a verbatim copy and paste from plaintiff's complaint. And it provides a direct comparison between counts one and two of plaintiff's complaint, which is disability claims. Count three, which is the medical malpractice claim. And that comparison, that direct comparison, shows that the three claims are a mirror image of each other. Yeah, but what if discrimination based on disability is the driver of the medical malpractice? Aren't you allowed to plead in the alternative? Your Honor, but you also sometimes plead yourself out of the cause of action. And I think that's what— If you do a comparison, that isn't what happened here with respect to both claims. Well, but the difference is you have these, one could argue, incriminating statements by the doctors about no quality of life and other patients are walking and talking. I mean, to me, the whole possibility of an ADA claim turns on those statements. And they may be disputed, but they're in the complaint. Certainly, but I think you have to look at the complaint as a whole in a 12B6 analysis. You have to look at all those— Well, we also have to look at it most favorably to the plaintiff. Correct, and even viewing— And again, my question is, what if the discriminatory motive based on disability was the driver of the alleged medical malpractice? Couldn't both of those claims survive? Possibly, Your Honor, but I don't think that's the case here. I think if you look at page 28 of the record, they clearly spell out what the doctor's medical evaluation was in both claims, counts one, two, and also three. They simply disagree with the prognosis that was provided to his court-appointed guardian, which was that his condition was irreversible and terminal. They also disagree with the substance treatment recommendation, which was to provide hospice treatment. And they simply maintain the doctors should have recommended the alternative treatment option that was provided on page 28 of the record to the court-appointed guardian, which was putting him on a ventilator. But as this court explained in the Carter opinion, quote, the relative prudence between two medical decisions is not actionable. So this is not simply a case where the doctors just withheld treatment or denied treatment. They gave the court-appointed guardian two options, and the court-appointed guardian made the decision to place him in hospice treatment. The court-appointed guardian did not consent to any other care whatsoever. Is it your position, I guess, that based on the complaint, the plaintiffs cannot show that what happened here was solely the source, solely caused by the discriminatory motive? Yes, absolutely, Your Honor. And I think it's... Where do we go to that? Where do we go in the record to find comfort on that conclusion? Uh, page 28, where the court-appointed guardian is provided with the different treatment options, including continuing care. And so this is similar to the Schiavo versus Schiavo case, both parties... Well, exactly. And the Schiavo case has got to be one of the darkest cases in American history. And... So I wouldn't rely... I mean, speaking for myself personally, I would not rely on that. Well, then I'm going to move on to my third point. Well, but no, before you do, I mean, counts of opposites says that the medical information that was given to the guardian was slanted because of the disability, the bias against his disability. Therefore, the guardian really couldn't make an informed choice, which is probably a bad choice of words, but couldn't really choose anything but, you know, let's go with that course of treatment. So if the guardian's not given balanced medical information, but is given slanted information based on the disability, how can that be... How can that save you? Well, if you look at page 28, the court or the doctor did provide balanced information. Plaintiffs simply disagreed with the prognosis and the recommendation. Both options were provided, and there's no allegation... Well, what do you do with... What do you do with the fact that a day or so after he goes into hospice, they say, oh my gosh, he's improving. Maybe we need to look at this again and go to the ethics committee. There's nothing in the record about anyone going to the ethics committee, is there? Not that they've alleged, but, Your Honor, their own allegations set forward the continued monitoring that he was provided while in hospice treatment. Well, what do you... I mean, how do you overcome that? To me, that suggests that their medical judgment should have changed, that they're acknowledging their medical judgment might have changed. And I see my time has expired. Can I answer your question? Please. Your Honor, I think my third point would have addressed that, which is also from the Carter case, and the policy considerations that this court undertook, Judge Richman, and that, in this case, like in Carter, Judge Albright ultimately granted summary judgment on that medical malpractice. Well, that's summary judgment. That's not 12b-6. The policy consideration underlying that is that these discrimination statutes should not be used as a vehicle to get around the requirements. Well, there's a line between hospice and euthanasia. So, just for Your Honor to address that point, Judge Albright applied the last chance survival doctrine from the Texas Supreme Court. Ultimately, the claim failed on the merits because that was not the case. His chance of survival were, in fact, what the doctors assess. If Your Honor— Well, we don't even have evidence about that, do we? What is in the record, and like the Carter case, that policy consideration that these claims should not be used to give, I think, the language that this court used— Would you please give us a copy of the Carter case? It would have been appropriate to— I mean, I'm sorry. I'm not familiar with it. It's brand new, Your Honor. And just for the record, the site is 144 F4809. But I will also provide a copy to Your Honor. Okay, thank you. Thank you for your time. Thank you. Mr. Milch?  Good morning, Your Honor. As may it please the Court, Stuart Milch from Cooper & Scully in Dallas. We represent Dr. Cantu, a hospital internist in Texas. There is not a single court in this country that has ever said Section 1983 is implicated when a private physician and a private guardian agree to withhold life-sustaining treatment from an incapacitated, terminally ill individual. We would just ask that this court decline plaintiff's invitation to make this the first such case. In fact, saying that Section 1983 is implicated here would open up a whole host of problems. I mean, let's imagine a scenario where a guardian and a mother or father agree that, you know, mom's lying in a hospital bed, guardian and dad agree that life-sustaining treatment should be withdrawn. But now an adult child comes in and objects. Can a physician, a private physician, private guardian be liable under Section 1983 under those circumstances? I usually get the question here, what's your best case for the proposition that you're  And the answer in this case is there really is no best case because we don't have a case where a court has held that 1983 is implicated under situations like this. And, I mean, if you just look at the complaint and plaintiff's acknowledgements, they acknowledge that Dr. Cantu is a privately employed physician. They acknowledge that Family Elmer Care is a private entity and that Ms. Drake is a private actor. So the only way they have a 1983 claim is if there is joint action or state action. And the joint action is based on one case out of Fourth Circuit. I believe they cite a case called Thomas S. V. Morrow where you had state actors employed by a state hospital caring for a gentleman who was a ward of the state since his birth. So we clearly have state action by guardians there. And there are at least four other cases in the federal courts, none from this circuit, unfortunately, but the Second, Third, Ninth, and Tenth Circuits have held that court-appointed guardians, simply because they are court-appointed, does not make them state actors for 1983 purposes. And that's the Kirtley and the Milan and the Leschko and the Meeker case that we cited in our briefs. Then the other case that they cite is the Texas Court of Appeals case, T. Elegance Children's Medical Center for the state action part of their analysis. And again, it doesn't apply because in T. Elegance you had a disagreement between the physician and the parents as far as what the appropriate course of treatment was. And state action is implicated there because when you have that disagreement, the physician has to apply with the statutory prerequisites of Section 166.046 of the Texas Health and Safety Code, which is literally about the process of dying. And what we do not have in this case is a disagreement between the guardian and the physician. I can address the informed consent and failure to guide claims, Your Honor, but we believe those are waived because plaintiffs specifically did not raise those objections to the Magistrate's important recommendation. And if you look at page 449 of the record, they specifically say that they are objecting only to the 1983 and disability-based discrimination claims. But didn't the district court rule on those on the merit? It did. And well, it accepted the report and recommendation, sure. But what they did not do is... Rule on the merit. Oh, well, they didn't object to it. Yeah. And so if the court even reviewed it, the review is for plain error, which is an incredibly high standard that they can't meet. And I'm not sure that they haven't waived that either because they didn't even raise it in their opening brief and only raised it when we pointed it out in our appellee's  Right. And if the court has no further questions, I would thank you for your time, Your Honors. All right, thank you. Mr. Beaman. Thank you, Your Honor. It's a plea of support. My name is Mark Beaman. I represent Dr. Vo in this matter. He is the patient care physician that evaluated Mr. Hickson and made the recommendation on a treatment decision form about saying hospice care would be appropriate. Your Honor, I did want to point out to Judge Jones one issue that Mr. Boucher was not able to address. But yes, hydration was stopped and slowed in hospice care. But part of the problem the plaintiff had is he had an acute encephalopathy that caused problems with his brain. And the problems with his brain affected his ability, he had dephagia, which created a situation where he could not control his secretions. And so when he's given hydration, the secretions go down into his lungs and make the problems. Where is that in the record? That is not in the record. Well, thanks a lot. I was just responding to your prior question. Yes, sir. I apologize for drifting away from the record. But I just wanted you to understand that. I mean, in Texas, well, never mind. All right. Your Honor, the first issue here is the informed consent plan that I'm going to address with respect to Dr. Vo. We believe Texas law is very clear under Section 74.001 that the obligation of a doctor with respect to an informed consent claim is to advise the patient or the patient's guardian in this case about what the risk of the procedures would be. And in this case, those risks would be hospice care and, of course, ultimate death under those situations. They're trying to provide a dignified way to die. Well, you know what? It's not very dignified when you don't allow the man, guardian or not, you don't allow him to talk to his family. Your Honor, Dr. Vo had nothing to do with talking to his family. Well, somebody did.  Was in intensive care. Actually, actually, what you say, Dr. Vo, is the ICU doctor? Yes, Your Honor. Is there a doctor in supervising hospice? Yes, Your Honor. Well, is that a different person? Yes, Your Honor. So, with respect to the informed consent, we believe the law is clear in Texas, Chapter 74, you advise the patient or the guardian of the risk. And we believe in this case, that's exactly what Dr. Vo did. Should those claims have been dismissed with prejudice or without prejudice? Your Honor, I don't know off the top of my head. Well, they were dismissed with prejudice, correct? That's fine. Why wouldn't plaintiff get a chance to plead new facts or augment what they've alleged before? Judge, I don't know. I did not see that. Well, if you don't know, isn't the default rule generally a without prejudice dismissal unless the plaintiff has had multiple opportunities or stated his or her best case? Yes, Your Honor. So, do you agree that we should remand that for a modification to dismissal without prejudice? No, Your Honor, I don't agree with that. But you can't tell me why? Well, in terms of the Chapter 74 claim, the law is clear that- Well, the law is clear, but the facts may not be. In other words, shouldn't they have a chance to allege the facts that might hurtle the law? They had that chance, Your Honor, and they had repetitive chances to do that. You're saying it's sort of, it's futile? Yes, Your Honor. Then why is that? Well, I can't tell you why they didn't come up with an expert and challenge- At the pleading stage? What? At the pleading stage, they're supposed to have an expert? Well, Your Honor, under Texas law, there is a requirement for an expert at that point, and that was part of the reason for the summary judgments. But we're talking about the dismissal of these claims on Rule 12, right? Yes. I mean, for the informed consent law, do you have to have an expert? Eventually, when the case goes to trial, Your Honor. Right, but this was dismissed. This was dismissed, Your Honor, and the reason it was dismissed is the law is clear that only the risks of the treatment have to be disclosed, and those risks were disclosed. But under the treatment decision form, it's clear. Dr. Doe wrote down what the risks of the treatment were, and they were disclosed. The- Well- So any informed, so instead of filing three pages of informed consent for ordinary surgery, all the doctor has to say is, may die. No, in terms of telling the patient about the risk, that is true. With respect to another negligence claim, the doctor has to explain what the treatment is. Potentially, what if the doctor can tell the patient what the success rates are? But those are not part of the informed consent. The only thing in the informed consent that the doctor's required to do in an informed consent are the hazards and risks. Now, there would be another case if the plaintiff sought negligence with respect to the other information that they claim was not provided, but that's a different panel. All right. I'll see the red line. Yes, sir. Thank you. Okay, Ms. Chertoff. Thank you, Jason. I want to start by addressing your question about the timeline of the guardian here. It's at ROA page 24. It's not the most clear. It says that Ms. Dixon filed in Travis County in October of 2019. And then, of course, Mr. Hudson died in June of 2020. And trainee Drake was appointed on April 1st of 2020. So at some point between October 2019 and April 1st is when family elder care came on. And initially, it was a non-trainee, Ms. Yates, who took over. Yeah, I know. And then I want to talk about the Carter case that one of my colleagues brought up. The Carter case is discussed on pages 10 and 11 of our reply brief. It came out within the week right before we filed our reply brief. And that case is distinguishable from this one because it doesn't involve an allegation of disparate treatment where someone with a disability is not getting a certain kind of medical care and a person without a disability is getting that medical care. It was a case involving someone who was incarcerated in a local jail. Right. I saw that case. I'm sorry. Yeah, all good. New case. There's a lot of them. And I think multiple of the cases cited in this brief actually started with the name Carter. I then wanted to turn to this discussion of whether Mr. Hickson had an irreversible and terminal condition. The counsel for the hospital represented that that was the conclusion of his doctor, that he had an irreversible and terminal condition. But the allegation and the facts, as we currently have them in the complaint, and this is on ROA page 27 at the very bottom, is that Mr. Hickson's condition was neither irreversible nor terminal. And in representing on the family elder care form, which is what appears on page 28 of the record, there was this statement by the hospital and by defendants here that his condition was, the outcome was futile, which is not consistent with the allegations of the other facts that we know here, which are one, that his condition was neither irreversible nor terminal, and two, that he in fact had a 70% chance of survival. Are we talking about which claims here? This goes to the, sorry, good clarification, Judge Wilson. I'm referring to the federal anti-discrimination claims.  Well, so is this the family elder care form, is that the one also that's the basis of the informed consent claims? Yes. I was going to ask about those. I forgot about this on the first go, but you didn't object to the magistrate judge's report and recommendations on the informed consent or failure to guide claims. That's correct. What are we to do with that? Because this would be plain error review. So how is it plainly erroneous that the magistrate judge's report or recommendation to dismiss those claims was wrong? It's plain error for two reasons. One is the issue that you were discussing with my colleagues, Judge Wilson, about the dismissal with prejudice. That was my next question. What are we to do with that when you didn't raise it, didn't object to that, and the district court just ruled? The plain error standard still applies, and I think the error that the court should be looking at here is the application of the motion to dismiss standard. And that's the error, the legal error that we'd ask the court to reverse on. That saying, well, you can't possibly have known what happened in this conversation because you weren't there, and that's the basis for dismissal, is not consistent with the motion to dismiss standards and the dismissal with prejudice standards. Why didn't you object? I can't speak. I wasn't there, Your Honor. I can't speak to that. Unfortunately, the trial counsel who originally brought this case has also passed away, so I can't even ask him, unfortunately. And then the other reason on your question, Judge Wilson, is that this framework about hospice and the type of information that needs to be provided for an informed consent claim really is illogical, and I think it's reading informed consent for hospice. Yeah, we put you in a hospice, and you're going to die, and therefore, will you give consent? Well, the whole premise of hospice is you're going to die. Exactly. Exactly, Judge Jeremy. So I think that's an additional legal error that we would ask the court to review on claim error. But ultimately, again, I just want to direct the court, this is a motion to dismiss, and the allegations in this case are really extreme, that Mr. Hickson, who had a loving family, who talked with them, who interacted with them, was just viewed as having no quality of life, and therefore, and we'd ask the court to reverse. Thank you very much. Thank you.